[No. 66276-7-I.   Division One.   August 13, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. BUD MICHAEL FRASER, *Appellant*.

14

*Maureen M. Cyr* (of *Washington Appellate Project*), for appellant.

*Mark K. Roe, Prosecuting Attorney*, and *Kathleen Webber* and *Seth A. Fine, Deputies*, for respondent.

¶1 Becker, J. — This is an appeal of a murder conviction. The defense was accident. The trial court allowed a police officer to testify about a statement made by the decedent in which he reported his fear of the defendant. Because the statement was testimonial and admitted for its truth, its admission violated the confrontation clause even though it did not violate the rule against hearsay. We nevertheless affirm, concluding that the error was harmless.

## FACTS

¶2 Appellant Bud Fraser shot Colin Cross in the face, killing him. Cross had been living with Fraser's ex-girlfriend, Danielle Sigmond. The State charged Fraser with first degree murder.

¶3 Trial began in October 2010. Sigmond testified that she had an on-and-off relationship with Fraser for about three years. In 2009, she began seeing Cross, but she also remained in communication with Fraser. When she moved into Cross's apartment, Fraser was angry. Sigmond testified that Fraser told her he was going to kill her boyfriend, but she did not take the threats seriously. Another witness testified that he saw Fraser attack Cross outside Sigmond's apartment in July 2009. When Cross went inside the apartment, Fraser tried to kick the door down and said Cross "better watch his back" because he was going to be "blasted."

¶4 Sigmond was a barista in a coffee stand in Everett in September 2009. She testified that she typically arrived before 5 a.m. to open up. Fraser often stopped by early in the morning on his way to work, to get coffee and talk to her. Sigmond said that in the two weeks leading up to the shooting, Fraser pursued her aggressively with requests to go out with him. He stopped at the coffee stand daily, and his calls and text messages became constant and repetitive.

¶5 Early on September 14, Cross drove Sigmond to the coffee stand in her car and dropped her off. Sigmond

expected Cross to come back for a cup of coffee after he parked. She heard a shot, went outside, and found Cross lying dead next to her car, bleeding from his head. A security camera showed that the shot occurred 78 seconds after Cross and Sigmond drove in.

¶6 Police arrived quickly. Sigmond identified a yellow car in a nearby parking lot as Fraser's. In the back of the car, police found the weapon, an AK-47 rifle. A blanket lay on the pavement not far from Cross's body. With the assistance of Fraser's cell phone carrier, police located Fraser in Ellensburg the next day and arrested him. Fraser at first indicated that he was surprised to be detained on suspicion of homicide. Asked what he knew about the Cross homicide, Fraser responded, "There's a lot of people who would want to kill Colin Cross."

¶7 At trial, Fraser admitted shooting Cross. He claimed the shooting was the unintended result of his reaction to an aggressive move by Cross. Fraser said he was waiting for Sigmond that morning at the coffee stand. He denied any feelings of jealousy; he said he was merely irritated with Sigmond for not answering his calls and text messages. He had never seen Cross drop Sigmond off at work before and wanted to know why Cross was there. He said Cross had threatened him in the past and he feared violence from Cross. He took his rifle and the blanket from the backseat of his car and, without checking the safety, carried it, barrel pointed downward, across the parking lot to where Cross was parked, with the intention of approaching Cross and talking to him. According to Fraser, Cross got out of the car, stood up, and confronted him. Fraser said that he postured to let Cross know he had a gun, hoping to "diffuse the situation," and Cross responded by lunging at him. Fraser testified that he jumped back with his arms raised up, and the gun accidentally went off. Panicked, he put the gun back in his car and hid until his father came and picked him up. Fraser said he then decided to hitchhike to Idaho and he was on his way there when police arrested him in Ellensburg.

¶8 Defense counsel asked the jury to return a verdict on the lesser offense of second degree manslaughter. The jury convicted Fraser of first degree murder, armed with a firearm. The court sentenced him to 30 years.

## CONFRONTATION: THE "NOT FOR TRUTH" EXCEPTION

¶9 The first issue concerns the admission of one sentence in a statement Cross gave to the police before his death. Cross called police in late May 2009. Officer Brian Lydell took a statement in which Cross reported that Fraser was harassing him with threatening calls and text messages:

> I started receiving text messages that were threatening on May 29th 2009 in regards to my girlfriend. I started dating Danielle Sigmond around April 20, 2009. Ever since I've started dating her I have been harassed by her ex boyfriend Bud Frasier. He has continually called and text message[d] me threats and cut downs. There is a no contact order on my girlfriend and Bud Frasier. My window has been smashed out in my truck also in my girlfriend's car. I am constantly being harassed and fear for my and my girlfriend's life. Have many threating messages and phone calls and just want it to stop. Have also filed two reports with Marysville Police Dept.

Pretrial, the State obtained the trial court's permission to admit, under ER 803(a)(3), a single sentence from this statement to show Cross's state of mind: "I am constantly being harassed and fear for my and my girlfriend's life." The State was anticipating Fraser's testimony that Cross either lunged at him or grabbed the gun, causing it to go off accidentally. The State argued that Cross's fear of Fraser would tend to prove that Cross would not have reacted aggressively when Fraser appeared with the gun.

¶10 When the State offered the statement during trial, Fraser objected that it violated his right of confrontation. The State responded that the statement was admissible

because (1) having killed Cross, Fraser had waived his right to confront him and (2) the statement was being offered to prove Cross's state of mind, not for the truth of the matter asserted. The court agreed to admit the statement but first cautioned the jury with a limiting instruction:

> This testimony, this evidence, is being allowed for Mr. Cross's state of mind that he made a statement to the police officer. And you would consider it for what his state of mind was, but not for the truth of the matter. Okay. Please proceed.

Officer Lydell testified that he had taken a statement from Cross after Cross called to complain about harassment by Fraser. He then read the single sentence from the statement. He testified that the investigation was concluded with no charges being filed.

¶11 Fraser contends the admission of the statement by Cross violated the confrontation clause of the Sixth Amendment. Our review is de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

¶12 The confrontation clause confers upon the accused the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. It applies to "witnesses" against the accused, in other words, those who "bear testimony." *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). The parties agree that the statement in question was testimonial. It was part of a formal signed statement Cross gave to the police, one he would reasonably expect to be available for prosecutorial use to prove some fact at a later trial. *See Crawford*, 541 U.S. at 51. Admission of a testimonial statement by an absent witness is generally permissible only where the declarant is unavailable, and only where the defendant had a prior opportunity to cross-examine. *Crawford*, 541 U.S. at 59.

¶13 To admit the statement by Cross, the trial court relied in part on an exception to the right of confrontation

known as forfeiture by wrongdoing. *See State v. Mason*, 160 Wn.2d 910, 162 P.3d 396 (2007), *cert. denied*, 553 U.S. 1035 (2008). As the State now properly concedes, that exception is applicable only if the defendant's wrongful act was designed to prevent the witness from testifying. *Giles v. California*, 554 U.S. 353, 359-60, 368, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). Here, there was no evidence Fraser killed Cross to stop him from testifying. To the extent *Mason* holds that the exception applies even where the defendant did not commit the wrongful act with the specific intent to prevent testimony, *Giles* overrules it. *State v. Fallentine*, 149 Wn. App. 614, 620 n.13, 215 P.3d 945, *review denied*, 166 Wn.2d 1028 (2009).

¶14 The issue, therefore, is whether the trial court properly admitted the statement on the second basis argued by the State, as an out-of-court statement not offered in evidence for the truth of the matter asserted. In *Crawford*, at note 9, the Supreme Court reaffirmed that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 60 n.9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985).

¶15 *Street* was a murder prosecution. The State introduced a confession made by the defendant to a sheriff. The defendant took the stand and testified that his confession was coerced. He claimed the sheriff read an accomplice's confession to him and directed him to say the same thing. Called in rebuttal, the sheriff denied the accusation. To corroborate his testimony, the prosecutor had the sheriff read part of the accomplice's confession to show that it was different from the defendant's confession. The trial court instructed the jury that the confession was admitted for rebuttal purposes only, not for the purpose of proving its truthfulness. Although the defendant did not have an opportunity to cross-examine the accomplice, the Supreme Court held the admission of the accomplice's statement did

not violate the confrontation clause. Though the statement had the potential to be used to prove that what the accomplice confessed was true, it was not actually used for that purpose. "If the jury had been asked to infer that [the accomplice's] confession proved that respondent participated in the murder, then the evidence would have been hearsay; and because [the accomplice] was not available for cross-examination, Confrontation Clause concerns would have been implicated." *Street*, 471 U.S. at 414. The Court found the limiting instruction effective and reasoned "there were no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." *Street*, 471 U.S. at 415.

¶16 The State wanted to use Cross's fear of Fraser to cast doubt on the credibility of Fraser's testimony that Cross lunged at him as he approached the car. The State maintains that the statement was not offered for the truth of the matter asserted. "Rather it was admitted to show the victim's state of mind."[1]

¶17 The State relies on *State v. Parr*, 93 Wn.2d 95, 606 P.2d 263 (1980), a homicide case with similar facts. In *Parr*, the defendant claimed that the shooting was an accident precipitated by the victim's attempt to reach for a gun. The victim had been heard to say she was afraid of the defendant. The Supreme Court approved admission of this testimony. The victim's expression of fear was relevant to rebut the defense of accident. Our Supreme Court held that in this situation, "the trial court should allow the State to prove the victim's declarations about his or her own state of mind, where relevant, but should not permit it to introduce testimony which describes conduct or words of the defendant." *Parr*, 93 Wn.2d at 104.

¶18 The admission of the statement in the present case complied with *Parr*. The jury did not hear what Cross

---

[1] Brief of Respondent at 21.

reported to the police about Fraser's threats and harassing conduct. The excerpt from Cross's statement was used only to prove Cross's state of mind—that he feared Fraser.

¶19 By arguing that compliance with *Parr* satisfies the confrontation clause, the State is confusing two lines of authority. *Parr* sets forth a rule of evidence now embodied in ER 803(a)(3). *Parr* holds that hearsay—an out of court statement offered to prove the truth of the matter asserted—may be admitted in some circumstances to prove the declarant's state of mind.

¶20 To survive a hearsay challenge "is not, per se, to survive a confrontation clause challenge." *Mason*, 160 Wn.2d at 922. If a witness is unavailable and there has been no prior opportunity to cross-examine, a testimonial statement must be *excluded* under the confrontation clause if it is offered for the truth of the matter asserted. *See Crawford*, 541 U.S. at 59.

¶21 In *Parr*, the decedent had declared she was afraid of the defendant, and that statement came in for its truth. Cross's testimonial statement that he was afraid of Fraser was likewise offered for its truth. It was used to prove Cross feared Fraser, not for some nonhearsay purpose comparable to what happened in *Street*. The fact that Cross's statement showed his state of mind does not save it from confrontation clause analysis. Only if it were true that Cross actually feared Fraser would his statement become relevant to rebut Fraser's testimony that Cross lunged at him. Because the statement was offered for its truth, the court erred by admitting it.

¶22 Confrontation clause errors are subject to harmless error analysis. *Jasper*, 174 Wn.2d at 117. "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182

(1985), *cert. denied*, 475 U.S. 1020 (1986). The appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *Guloy*, 104 Wn.2d at 426. The State must show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Jasper*, 174 Wn.2d at 117.

¶23 There was overwhelming untainted evidence showing that Fraser had given Cross reason to be afraid of him. Fraser had attacked Cross at Sigmond's apartment. Sigmond and other witnesses heard Fraser threaten to kill Cross. Fraser sent threatening text messages to Cross. Cross could not have escaped knowing that Fraser was a hostile, jealous, and possessive ex-boyfriend who wanted him out of the picture. The statement by Cross that he feared Fraser was a minor component of the State's evidence. Cross's state of mind was not mentioned during the State's closing argument. We see no likelihood that the erroneously admitted statement by Cross influenced the jury in any significant way.

¶24 In addition, the State's evidence of premeditation was compelling. In the days leading up to the shooting, Fraser called Sigmond constantly. Inconsistent with his denial of a jealous motive, he sent Sigmond hundreds of intense, pleading text messages, repeatedly saying he loved her and demanding that she meet him and talk to him. A message sent on September 8 said, "If you wit another boy, I swear on our love I will kill him. Please answer me." On September 14, Fraser arrived at the coffee stand unusually early, armed with an assault rifle. Sigmond had not previously seen him carry a gun in his car. As soon as Cross arrived, Fraser got out of the car with the rifle and blanket. He approached Cross without warning and shot him directly in the face at close range.

¶25 The State has borne its burden of showing beyond a reasonable doubt that the exclusion of Cross's statement would not have resulted in a different verdict. We conclude the error was harmless.

## CELL PHONE RECORDS

¶26 Fraser next raises a confrontation clause challenge to the trial court's decision to admit two exhibits documenting Fraser's cell phone communications with Sigmond. Exhibit 1 displays the content of text messages sent and received from Fraser's phone number during the two weeks before the shooting. It includes hundreds of messages sent by Fraser to Sigmond. Exhibit 45 is a report listing the dates and phone numbers for activity on Fraser's phone during the same period of time. It shows 54 calls, as distinct from text messages, to Sigmond's phone. The State used these exhibits to prove that Fraser was obsessed with Sigmond and jealous of Cross. The records were introduced through the testimony of a witness from the cell phone company who explained how the reports were generated from stored data. The witness had created similar reports in the past, but he was not the person who prepared the reports included in the two exhibits. In the trial court, Fraser objected unsuccessfully on the basis that the records, in sum and individually, were more prejudicial than probative. He does not pursue that objection on appeal. Instead, he now argues he had a right to confront the person who created the reports.

¶27 Fraser did not raise the confrontation issue below. He contends the admission of the cell phone records was a manifest constitutional error that can be raised for the first time on appeal under RAP 2.5(a) and *State v. Lee*, 159 Wn. App. 795, 813-14, 247 P.3d 470 (2011).

¶28 This court recently decided that under controlling United States Supreme Court precedent, a failure to assert the confrontation right at or before trial results in the right being forfeited. *State v. O'Cain*, 169 Wn. App. 228, 279 P.3d 926 (2012). The rationale of *O'Cain* is that if a right is forfeited by the defendant, nothing the trial court does or fails to do is a denial of the right, and if there is no denial of

a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review. "This rule protects the integrity of judicial proceedings by denying a defendant the opportunity to sit on his rights, bet on the verdict, and then, if the verdict is adverse, gain a retrial by asserting his rights for the first time on appeal." *O'Cain*, 169 Wn. App. at 243.

¶29 The circumstances of this case are similar to *O'Cain*, and they illustrate the problem at which the holding of *O'Cain* is directed. Fraser is arguing that he should have been able to cross-examine the person who actually prepared the reports. Had he made this claim at trial, the trial court could have required the State either to call the witness who actually prepared the reports or forgo the evidence. Fraser may have decided for strategic reasons that he preferred to confront a witness who was less familiar with the exhibits. "It would be a strange rule of law that permitted a defendant to obtain a new trial under such circumstances." *O'Cain*, 169 Wn. App. at 242 n.8.

¶30 By raising his objection for the first time on appeal, Fraser essentially argues that the trial judge should "be placed in the position of sua sponte interposing confrontation objections on the defendant's behalf—or risk knowingly presiding over a trial headed for apparent reversal on appeal." *O'Cain*, 169 Wn. App. at 243. As we said in *O'Cain*, such a state of affairs is obviously untenable. *O'Cain*, 169 Wn. App. at 243. Under *O'Cain*, Fraser waived his confrontation clause argument about the cell phone records by failing to object, and we so hold.

¶31 We acknowledged in *O'Cain* that under *Melendez-Diaz v. Massachusetts*, the States "may adopt procedural rules" governing the exercise of confrontation clause objections. 557 U.S. 305, 314 n.3, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), *quoted in O'Cain*, 169 Wn. App. at 237. Arguably, RAP 2.5(a) is a procedural rule by which Washington State allows defendants to raise confrontation clause objections for the first time on appeal if they can show a manifest

error. If so, we alternatively hold that Fraser has failed to make a showing that the alleged error was manifest.

¶32 As a general rule, appellate courts will not consider issues raised for the first time on appeal. RAP 2.5(a). However, a claim of error may be raised for the first time on appeal if it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988). Constitutional errors are treated specially because they often result in serious injustice to the accused. *Scott*, 110 Wn.2d at 686. On the other hand, permitting every possible constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials and is wasteful of the limited resources of prosecutors, public defenders, and courts. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). To warrant review, the asserted error must be "manifest." What makes an error "manifest" is a showing of actual prejudice. *McFarland*, 127 Wn.2d at 333.

¶33 Only after the appellate court has determined the asserted error to be a manifest constitutional error may the court undertake a harmless error analysis. *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009). Thus, determining whether the defendant was actually prejudiced by an alleged error is a different analysis than whether an error warrants a reversal. *O'Hara*, 167 Wn.2d at 99. Determination of actual prejudice requires a focus on whether the error is "obvious on the record." *O'Hara*, 167 Wn.2d at 100. "It is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their actions or failure to object." *O'Hara*, 167 Wn.2d at 100. The appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error. *O'Hara*, 167 Wn.2d at 100.

¶34 Applying these principles here leads to the conclusion that the trial court did not commit manifest error by allowing Fraser's cell phone records to come into evidence through the testimony of a witness who did not personally query the cell phone company's data storage system. This is not a case like *Lee*, where the cell phone records, admitted by certificate, corroborated the only eyewitness to a homicide where the identity of the murderers was contested. *Lee*, 159 Wn. App. at 813-14. In *Lee*, admission of the records had practical and identifiable consequences at trial, making the alleged error manifest and warranting review despite the lack of objection in the trial court. *Lee*, 159 Wn. App. at 814. (Upon reviewing the alleged error, the court ultimately concluded that there was no error. *Lee*, 159 Wn. App. at 818.)

¶35 Here, unlike in *Lee*, admission of the phone records proved what other evidence had already established: Fraser was obsessed with getting Sigmond back, and he was threatening towards Cross. For example, Fraser has not challenged the admission of exhibit 54, a record of his threatening text messages to Cross's cell phone in early June 2009. One message said Fraser was finding out where Cross lived and worked. Another message told Cross to "gimi bak mi girl n i wont hurt u 2 bad" and warned him to get a "big gun" because "i got bounti out 4 u" and "i got big fam." Fraser added, "She mine n u bes pak that gun whereva u go cuz i will get u or sumbudi i no."

¶36 Defense counsel's objection at trial to the admission of Cross's statement to the police shows that counsel knew how to make a confrontation clause objection. The judge was entitled to assume that the defense had strategic reasons for choosing not to object to the testimony of the custodian of the cell phone records on confrontation clause

grounds.[2] Exhibits 1 and 45 corroborated the already abundant evidence of Fraser's motive. No error would have manifested itself to the trial court under these circumstances. Because no error was manifest, we do not review the claimed error, and thus we express no opinion concerning admissibility of phone records through a witness who has not personally searched the database.

¶37 Finally, even if admission of the records was a manifest constitutional error, harmless error analysis is appropriate. Fraser contends the cell phone records were of central importance to the State's proof that he acted with premeditated intent. The State prepared an illustrative summary and time line showing how Fraser's calls and messages increased in frequency and intensity in early September 2009. The State used this information at trial and emphasized it in closing argument.

¶38 The cell phone records did support the State's argument that Fraser's obsessively jealous and threatening behavior escalated just before the homicide. But the untainted evidence proved the same point. And even without the phone records, the evidence showing that Fraser was lying in wait with the gun and blanket was compelling evidence of premeditated intent. If it was manifest error to admit exhibits 1 and 45, the error was harmless.

## GRAPHIC PHOTOGRAPH

¶39 Fraser challenges the trial court's ruling admitting an autopsy photograph. A metal rod was placed through the hole in Cross's face to illustrate the path of the bullet. One photo showed most of Cross's face with the rod going through it. Another, a close-up, showed the damage inside Cross's mouth. Fraser argues this photograph should have been excluded because it was cumulative and gruesome. *See* ER 403.

---

[2] Such an assumption would have been reinforced by defense counsel's introduction of a different report of text messages through the same witness as exhibit 70. Report of Proceedings at 512-13.

¶40 The admissibility of photographs is generally within the sound discretion of the trial court, and this court reviews for an abuse of discretion. *State v. Stackhouse*, 90 Wn. App. 344, 357, 957 P.2d 218, *review denied*, 136 Wn.2d 1002 (1998). The photograph helped illustrate the medical examiner's testimony on the damage caused by the bullet and the trajectory of the bullet and showed details the other photograph did not. These were relevant topics. The record does not indicate the photograph was used to inflame the jury. The trial court's balancing of the probative value of the photo against any unfair prejudice was rational. We find no abuse of discretion.

## ASSISTANCE OF COUNSEL

¶41 Fraser, pro se, has filed a statement of additional grounds under RAP 10.10. He raises the issue of ineffective assistance of counsel. To establish ineffective assistance of counsel, Fraser must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

¶42 Fraser asserts that counsel failed to call a qualified expert witness to testify about crime scene reconstruction and ballistics analysis in a way that would have supported his defense of accidental shooting. Whether counsel could have found an expert willing to testify as Fraser desired will not be considered on direct appeal as it is speculative and beyond the record. *See McFarland*, 127 Wn.2d at 338.

¶43 Fraser also states that counsel made a closing argument that was ineffective because it characterized the main issue as one of "intent versus accident." Fraser implies that counsel should have argued that the shooting was unintentional, not accidental. Considered in context, the argument adequately conveyed Fraser's position that he was guilty only of manslaughter because he did not intend to fire the gun.

¶44 Fraser does not present grounds that warrant further review under RAP 10.10.

¶45 Affirmed.

SPEARMAN, A.C.J., and LAU, J., concur.

Review denied at 176 Wn.2d 1022 (2013).